1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6           FOR THE EASTERN DISTRICT OF CALIFORNIA

7

8    EVANSTON INSURANCE CO.,

9           Plaintiff,

10      v.                                    CIV-S-02-1505 DFL PAN
                                              CIV-S-02-1981 DFL PAN
11   OEA, INC., and DOES 1-20,
12   inclusive,                               MEMORANDUM OF OPINION
                                                   AND ORDER
13           Defendants.

14

15   ROYAL INSURANCE CO. OF AMERICA,

16           Plaintiff,

17      V.

18   OEA, INC., et al.,

19           Defendants.

20

21   OEA, INC.,

22           Counterclaimant,

23      v.

24   EVANSTON INSURANCE CO., et al.,

25

26           Counterdefendants.

This action involves an insurance coverage dispute relating to two accidents that occurred at the OEA Aerospace plant in Fairfield, California.  The employees injured in those accidents sued OEA Aerospace ("Aerospace") and OEA, Inc. ("OEA") for damages.  At the time of the accidents and subsequently, OEA was insured by several different insurance companies.  All of these insurance companies have refused to indemnify OEA and all but one refused to defend OEA in the matter.

This is the second round of summary judgment motions in this case.  In September 2003, the court granted summary judgment in favor of Evanston Insurance Company ("Evanston"), Royal Insurance Company of America ("Royal"), and Certain Underwriters at Lloyd's of London, et. al. ("Lloyd's"), but denied summary judgment as to Nutmeg Insurance Company ("Nutmeg") and Twin City Fire Insurance Company ("Twin City").  OEA, Twin City, and Nutmeg have now filed cross-motions for summary judgment on the issues left unresolved by the court's earlier ruling.  Additionally, OEA has moved for reconsideration of the court's earlier rulings in favor of Evanston, Royal, and Lloyd's.

I.

OEA is a Delaware corporation with its principal place of business in Denver, Colorado.  (09/22/2003 Order at 2.)  Until 1994, it manufactured items for use in the aerospace industry, and many of its products have an explosive component, such as the booster cups that caused the injuries at issue in this case.  (Id.)  Aerospace is located in Fairfield, California, and is a

2

wholly owned subsidiary of OEA.  (Id.)  OEA alleges that it

transferred its aerospace business to Aerospace in 1994 and, from

that point on, limited its focus to manufacturing automotive

safety devices.  (Id.)

In two incidents in late 1995 and early 1996, two Aerospace

employees -- Patricia Shugart ("Shugart") and Karen Wise

("Wise")-- were injured while repairing booster caps originally

sold and manufactured by OEA.  (Id.)  Shugart filed suit on

December 18, 1996, and Wise filed suit on February 6, 1997.

(Id.)  Shugart and Wise were represented by the same attorney and

the two complaints were virtually identical.  (Id.)  The named

defendants in both actions were "OEA, OEA Aerospace, and Does 1

through 200."  (Id.)  Both complaints described an explosion at

"OEA Aerospace . . . in Fairfield, California" and stated that

the premises were "owned, maintained, managed and operated by

OEA, OEA Aerospace."  (Id. at 3-4.)  The complaints asserted that

"OEA, OEA Aerospace . . . were engaged in the manufacture,

distribution, and/or sale of explosive items. . . ."  (Id. at 4.)

Additionally, the complaints listed OEA and Aerospace as separate

defendants and business organizations in a section of the form

complaint that requests organizational information about any

defendant.  (Id. at 9.)

Although Aerospace was served with Shugart's complaint on

June 10, 1997, OEA was not served with the complaint until over a

year later, on October 23, 1998.  (Id.)  On November 3, 1997,

James Welsh ("Welsh"), OEA's Director of Personnel and Security,

3

was served with the Wise complaint as "Agent for Service of Process of OEA Aerospace, Inc." (Id.)  However, Welsh was not the agent for service of process for Aerospace.  (Id.)  It does not appear that there was any other attempt to serve either OEA or Aerospace.  (Id.)

When Aerospace received the Shugart complaint in June 1997, it forwarded a copy to Welsh at OEA, but Welsh allegedly concluded that Shugart's claims would be handled exclusively as a worker's compensation claim because Shugart was an Aerospace employee.  (Id.)  He notified CIGNA, the worker's compensation insurance carrier for Aerospace, of the claim.  (Id.)  OEA asserts that the agent Welsh notified was Patricia Hollenbeck ("Hollenbeck").  (Id.)  The same process was followed with the Wise complaint.  (Id. at 4-5.)

In July 2002, following a jury trial, a $13,680,565 judgment was entered against OEA in the Shugart suit, which included $10 million in punitive damages.  (Nutmeg and Twin City Mot. at 19-20.)  However, on June 27, 2005, the California Court of Appeal overturned the jury award and remanded the case for a new trial.  Shugart v. OEA, Inc., 2005 WL 1503812, at *1 (Cal.App.1 June 27, 2005).  Shortly after the Shugart trial, OEA settled the Wise suit.  (09/22/2003 Order at 5.)

Evanston and Royal each filed suit against OEA for breach of contract, intentional misrepresentation, and rescission of insurance contract.  (Id.)  After removing these suits to federal court, OEA counterclaimed against Evanston, Royal, Nutmeg, Twin

City, and Lloyd's for breach of contract and breach of the covenant of good faith and fair dealing.  (Id. at 6.)

In June 2003, OEA and all five insurance companies filed cross-motions for summary judgment on the issue of whether there was coverage for the Wise and Shugart claims under each policy. In an order filed September 22, 2003, the court found that the Evanston and Royal insurance policies did not cover the claims because they were first "made" prior to the Evanston and Royal insurance policy period.  (Id. at 6-11.)  Likewise, the court ruled that Lloyd's had no obligation to cover the claims because OEA breached the insurance policy's notice provision by delaying over two years in giving Lloyd's written notice of the claims. (Id. at 34-35.)  The court, therefore, granted summary judgment in favor of Evanston, Royal, and Lloyd's.  However, the court found that several unresolved disputes prevented a determination of whether the Nutmeg and Twin City policies covered the claims. (Id. at 12-18, 24-25.)

OEA, Twin City, and Nutmeg now bring cross-motions for summary judgment on the issues left unresolved by the court's earlier ruling.  Additionally, OEA moves for reconsideration of the summary judgment rulings in favor of Evanston, Royal, and Lloyd's.

II.

A.  Evanston and Royal

The Evanston policy was a general liability policy that provided coverage of $1 million per occurrence and $2 million

1  aggregate.  (OEA Mot. at 2.)  It was in effect from May 1, 1998

2  through May 1, 1999.  (Id.)  The policy states that it covers

3  "all sums in excess of the deductible amount . . . which the

4  insured shall become legally obligated to pay as damages as a

5  result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY

6  PERIOD for personal injury or property damage to which this

7  insurance applies. . . ."  (Id., emphasis in original.)  "Claim"

8  is defined in the policy as "a notice received by the insured of

9  an intention to hold the insured responsible for an occurrence

10 involving this policy and shall include the service of suit or

11 institution of arbitration proceedings against the insured."

12 (Id.)

13      The Royal policy was a "Commercial Catastrophe Liability

14 Policy" that provided excess coverage above the Evanston policy.

15 (Id. at 2-3.)  The policy period was the same as the Evanston

16 policy, May 1, 1998 to May 1, 1999.  (Id.)  Like the Evanston

17 policy, the Royal policy was a "claims made" policy that only

18 provided coverage for claims first made during the policy period.

19 (Id. at 3.)

20      The court previously found that the Shugart and Wise claims

21 were not covered by these policies because OEA became aware of

22 the claims against it before the inception of the policy period,

23 when it received copies of the Shugart and Wise complaints in

24 June 1997 and November 1997 respectively.  (Id. at 10-11.)  OEA

25 had argued that Welsh did not realize that any claim was made

26 against OEA until OEA was served with the Shugart complaint in

1  October 1998, believing instead that the Shugart and Wise claims

2  were worker's compensation claims against Aeorspace only.

3  (09/22/2003 Order at 7.)   However, the court found Welsh's

4  subjective belief to be insufficient.  (Id. at 8.)  Rather,

5  "[t]he critical issue is whether on any reasonable reading of the

6  complaints both OEA and Aerospace are named as defendants."  (Id.

7  at 8.)  Based upon a reading of the Shugart and Wise complaints,

8  the court found that OEA was named as a defendant by the

9  complaints and, accordingly, granted summary judgment to Evanston

10 and Royal.  (Id. at 10.)

11     OEA now moves for reconsideration of this ruling, claiming

12 that it has newly discovered facts that call the ruling into

13 question.  The new facts, OEA argues, show that Hollenbeck, the

14 experienced insurance agent, believed the Shugart and Wise claims

15 were workers compensation claims against Aerospace only.  (OEA

16 Mot. at 6.)  The new facts consist primarily of Hollenbeck's

17 deposition and numerous communications between Hollenbeck and

18 other individuals about the Wise and Shugart claims.

19     This "new" evidence does not call into question the court's

20 earlier ruling.  The basis of the court's ruling was that the

21 Shugart and Wise complaints gave reasonable notice that OEA was

22 named as a separate defendant in a civil liability suit.  Just as

23 the court found Welsh's subjective belief insufficient,

24 Hollenbeck's equally mistaken belief is also insufficient.  In

25 fact, Hollenbeck's subjective belief is even less persuasive than

26 Welsh's, given that her understanding was not based on a personal

review of the complaints themselves, but on communications with Welsh.  (Moak Decl. Ex. A, at 59-60.)

Moreover, Hollenbeck's belief that the claims were worker's compensation claims is not really a "new" fact,  given that OEA submitted arguments and evidence to that effect as part of its earlier summary judgment motion.  (Evanston Opp'n at 5-6.) Although the deposition testimony of Hollenbeck and other submitted documents are "new" in that they were not available at the time of the first summary judgment motion, they add little, if anything, to OEA's earlier arguments.  For the above reasons, OEA's motion to reconsider is DENIED.[1]

B.  Lloyd's

OEA subscribed to a surplus-line insurance policy from Lloyd's, entitled "Aircraft Builders Products Liability Policy," for the policy period August 1, 1995 to August 1, 1996. (09/22/2003 Order at 25.)  The policy's notice provision states in part that: "written notice shall be given by or on behalf of the Insured to the Insurers through their authorized agents as

---

[1]  Evanston and Royal also argue that OEA's motion should be denied because OEA has not met the requirements of Rule 60(b) and L.R. 78-230(k).  (Evanston Opp'n at 4-7; Royal Opp'n at 3-6.) These arguments fail because they are premised on the incorrect assumption that this motion to reconsider is governed by Rule 60(b).  Rule 60(b) only applies to motions to reconsider "final orders."  The court retains, as part of its inherent powers, the right to reconsider its earlier interlocutory orders, notwithstanding Rule 60(b).  United States v. Iron Mountain Mines, Inc., 812 F.Supp. 1528, 1555 (E.D.Cal. 1992).  Because the earlier ruling was not a final order, OEA's motion falls within the court's inherent discretion to reconsider its earlier interlocutory orders.

soon as practicable." (09/22/2003 Order at 26.)  The policy also requires that "[i]f a claim is made or suit is brought against the Insured the Insured shall as soon as practicable forward to the Insurers' authorized agents every demand, notice, summons or other process received by him or his representative." (<u>Id.</u>)  OEA did not give Lloyd's notice of the Shugart and Wise claims until it forwarded the complaints to the Lloyd's insurance broker on October 30, 2000.  (<u>Id.</u> at 26-27.)

   The court previously granted summary judgment in favor of Lloyd's, holding that OEA's two year delay in providing notice of the Shugart and Wise suits breached the notice provision of the insurance policy. (<u>Id.</u> at 34-35.)  This ruling was premised, in large part, on the court's determination that Colorado law, rather than California law, governed the interpretation of the policy.  Although the Shugart and Wise accidents occurred in California, the Lloyd's policy, which was negotiated and received in Colorado, specified that Colorado law would govern the interpretation of its terms and conditions.  (Lloyd's Opp'n at 4.)

   At the time of the earlier ruling, California and Colorado law differed in their treatment of insurance policy notice provisions.  (<u>Id.</u> at 27-28.)  Under California's notice-prejudice rule, the failure of an insured to give prompt notice of a claim to an insurer is not a defense to coverage unless the insurance company also proves prejudice.  <u>Pacific Employers Ins. Co. v. Superior Court</u>, 221 Cal.App.3d 1348, 1357, 270 Cal.Rptr. 779

1  (1990).  However, Colorado law had not adopted the

2  notice-prejudice rule, except with regard to automobile insurance

3  policies with uninsured motorist provisions.  Clementi v.

4  Nationwide Mut. Fire Ins. Co., 16 P.3d 223, 224 (Colo. 2001).

5  Under then-existing Colorado law, lack of timely notice by the

6  insured automatically violated the insurance contract and voided

7  the insurer's duty to indemnify, regardless of whether an insurer

8  could show prejudice from the untimely notice.  Id. at 225.

9       Applying California's governmental interest analysis, the

10  court concluded that Colorado law governed the policy and,

11  therefore, the lack of timely notice automatically violated the

12  insurance contract.  (09/22/2003 Order at 35.)  However, in a

13  footnote, the court noted that the Colorado Supreme Court had

14  granted certiorari to consider the validity of the traditional

15  Colorado late-notice rule with respect to liability insurance

16  policies.  (Id. at 28 n.14.)  The court stated that depending on

17  how the Colorado Supreme Court resolved that issue, "the court

18  may be required to reconsider the choice of law analysis."  (Id.)

19       This footnote proved prescient.  On January 31, 2005, the

20  Colorado Supreme Court issued a decision overturning its

21  long-established notice standard and adopting a notice-prejudice

22  standard for all insurance policies.  Friedland v. Travelers

23  Indem. Co., 105 P.3d 639, 647 (Colo. 2005).  Colorado's new rule

24  is similar to California's rule, requiring the insurer to

25  demonstrate it was prejudiced by the untimely notice.  Id.

26       OEA now seeks reconsideration of the court's earlier ruling

in favor of Lloyd's, arguing that in light of this change in the
law, the notice-prejudice rule, rather than Colorado's
now-rejected "notice rule," governs the policy.  (OEA Mot. at 2.)
As Lloyd's concedes, this motion for reconsideration hinges on
whether Friedland should be applied retroactively.  (Lloyd's
Opp'n at 2.)  If yes, a notice-prejudice rule (whether it be
California's or Colorado's) governs this case, and Lloyd's must
show it was prejudiced in order to prevail based on this notice
provision.  If no, no basis exists for re-examining the court's
choice-of-law analysis in the earlier summary judgment order.[2]

    The court finds that Friedland should be applied
retroactively to the present case.  As a general matter, federal
courts, sitting in diversity, apply the state's law as presently
defined by the state's highest court, regardless of whether the
law was altered while the federal case was pending.  Vandenbark
v. Owens-Illinois Glass Co., 311 U.S. 538, 543, 61 S.Ct. 347
(1941); Kona Enters., Inc v. Bishop, 229 F.3d 877, 886-87 (9th
Cir. 2000); FBW Enters. v. Victorio Co., 821 F.2d 1393, 1395 (9th
Cir. 1987); Plyler v. Wheaton Van Lines, 640 F.2d 1091, 1093 (9th
Cir. 1981); Nelson v. Brunswick Corp., 503 F.2d 376, 381-82 (9th
Cir. 1974).  This rule is especially strong where the decision
creating the new rule "itself retroactively applied the court's

_____

    [2]  Like Evanston and Royal, Lloyd's also argues that OEA has
failed to show the "extraordinary circumstances" necessary to
obtain relief under Rule 60(b).  (Lloyd's Opp'n at 6.)  However,
as noted above, this argument fails because it is premised on the
incorrect assumption that OEA's motion for reconsideration is
governed by Rule 60(b).

new holding" to the litigants in the very case.[3]  FBW Enter., 821
F.2d at 1395 (stating that where decision creating new rule
itself retroactively applied the court's new ruling, both state
law and federal law mandate its retroactive application to
pending cases).  Here, the Friedland court applied its
newly-created notice-prejudice rule retroactively when it
reversed the trial court's issuance of summary judgment against
the plaintiff.[4]  105 P.3d at 649.

Despite this case law, Lloyd's contends that the court must
determine whether to apply Friedland retroactively in this case
based upon an examination of Colorado's retroactivity analysis.
(Lloyd's Opp'n at 11-13.)  Even if Lloyd's is correct, Colorado's
retroactivity analysis yields the same result.

Colorado adheres to the generally accepted presumption that

---

[3]  Several Ninth Circuit cases have questioned the
appropriateness of applying the Vandenbark rule in a "hard and
fast" manner in diversity cases, and have done so only after
concluding that the state court would also give retroactive
effect to its new decision.  E.g., FBW, Inc., 821 F.2d at 1395;
Nelson, 503 F.2d at 381-82.  However, whether the court applies
Vandenbark's "hard and fast" rule or this more flexible approach,
the outcome in this case would be the same.  As discussed above,
Ninth Circuit cases have held that Vandenbark's rule and state
law yield the same results where, as here, the decision creating
the new rule "itself retroactively applied the court's new
holding" to the litigants in the case.  FBW, Inc., 821 F.2d at
1395.

[4]  In further support of Friedland's retroactive
application, Colorado courts have applied Clementi -- which
adopted the notice-prejudice rule in the context of uninsured
motorist provisions -- retroactively on several occasions.  See
State Farm Mut. Auto Ins. Co. v. Brekke, 105 P.3d 177, 181-82,
191 (Colo. 2004); Brown v. Silvern, 45 P.3d 749, 753 (Colo. App.
2001).

1   judicial decisions will have retroactive application. <u>Martin</u>

2 <u>Marietta Corp. v. Lorenz</u>, 823 P.2d 100, 111 (Colo. 1992).

3 Whether Colorado courts will give a judicial decision retroactive

4 effect is evaluated under the three-part test enunciated by the

5 United States Supreme Court in <u>Chevron Oil Co. v. Huson</u>, 404 U.S.

6 97, 92 S.Ct. 349 (1971). <u>Marinez v. Indus. Comm'n of Colo.</u>, 746

7 P.2d 552, 556 (Colo. 1987). First, a "decision to be applied

8 nonretroactively must establish a new principle of law."

9 <u>Chevron</u>, 404 U.S. at 106. Second, the court must "weigh the

10 merits and demerits [of retroactive application] in each case by

11 looking to the history of the rule in question, its purpose and

12 effect, and whether retroactive application will further or

13 retard its operation." <u>Id.</u> at 106-07. Third, the court must

14 weigh the inequity that would be imposed by retroactive

15 application in order to avoid injustice or hardship. <u>Id.</u> at 107.

16     Here, applying <u>Friedland</u>'s rule retroactively will further

17 the purposes of the new rule. One of the reasons given by the

18 <u>Friedland</u> court for adopting the new rule was to prevent the

19 insurer from receiving a windfall, and the insured not receiving

20 policy benefits, due to a technicality. <u>Friedland</u>, 105 P.3d at

21 645-46. Applying the rule retroactively would further this

22 stated purpose by preventing Lloyd's from avoiding its coverage

23 obligations due to this "technicality."

24     Additionally, Lloyd's has not shown that applying <u>Friedland</u>

25 retroactively would cause an injustice or extreme hardship.

26 Although Lloyd's complains that retroactive application of

1  _Friedland_ would penalize it for exercising its contractual rights

2  under the law as it then existed and force it to determine its

3  bargained-for-agreement by a standard which was not law at the

4  relevant time, this is always the case when a new rule is applied

5  retroactively.[5]  (Lloyd's Opp'n at 20-22.)

6      For the above reasons, the court finds that _Friedland_

7  applies retroactively to the present case.  Accordingly, the

8  court GRANTS OEA's motion for reconsideration.[6]

9  C.  Nutmeg and Twin City

10     The Nutmeg policy is a an "Excess General Liability

11  Insurance Policy," which was in effect from May 1, 1995 through

12  May 1, 1998.  (Nutmeg Opp'n at 10.)  OEA and Aerospace are both

13  named as an insured under the policy.  (09/22/2003 Order at 12.)

14  The policy contains an "employment exclusion" clause, which

15  states that the policy does not apply to "[b]odily injury . . .

16

17  ────────────────

18      [5]  Lloyd's also argues that retroactive application of
   _Friedland_ would create a grave injustice because doing so would
19  conflict with the general rule in California and Colorado that
   duty-to-defend determinations, as opposed to breach of contract
20  determinations, must be made based upon the law applicable at the
   time the claim was tendered to the insurance company.  (Lloyd's
21  Opp'n at 23-24.)   However, assuming Lloyd's is correct regarding
   the proper analysis for duty-to-defend claims, the court can
22  analyze the breach of contract claim separately from the
   duty-to-defend claim.

23      [6]  Lloyd's contends that, even if _Friedland_ is applied
24  retroactively, a conflict still exists between California's and
   Colorado's notice-prejudice rules.  (Lloyd's Opp'n at 8.)
25  However, at the hearing on this matter, the parties agreed that
   the court need not address this issue at this time.  The court
26  agrees.  If Lloyd's chooses to make a new motion for summary
   judgment on the basis of the policy's notice provision, the court
   will then determine which state's notice-prejudice law applies.

1   sustained by any person as the result of an occurrence directly

2   or indirectly relating to the employment or prospective

3   employment of any person by any insured." (Id.)  The policy also

4   contains a "separation of insureds" clause which provides that

5   "[e]xcept with respect to the Limits of Liability, and any rights

6   or duties specifically assigned in this policy to the Named

7   Insured . . ., this insurance applies: a. As [if] each Named

8   Insured were the only Named Insured; and b. Separately to each

9   insured against whom claim or suit is brought." (Id. at 15.)

10      The Twin City policy is an umbrella policy over the Nutmeg

11  policy, and was in effect from May 1, 1996 until May 1, 1998.

12  (Id. at 19.)  A "Claims Made Limitation Endorsement" in the Twin

13  City policy provides that the policy will attach as excess

14  insurance "to such 'claims' on the same basis, subject to all

15  limitations upon coverage and other policy terms and conditions

16  of such 'Controlling Underlying Insurance Policy.'" (Pappas

17  Decl. Ex. D. at 291.)  The endorsement specifies that the Nutmeg

18  policy is the "Controlling Underlying Insurance Policy." (Id.)

19  Accordingly, to the extent that the Shugart and Wise claims are

20  not covered by the Nutmeg policy, they are, likewise, not covered

21  by Twin City's policy.[7]

22

23      [7] OEA contends that if the employment exclusion clause of
    the Nutmeg policy is incorporated into the Twin City policy, such
24  terms would conflict with certain exclusions included in the Twin
    City policy, thereby creating an ambiguity. (OEA Reply at 1-3.)
25  This argument lacks persuasiveness given the clear and explicit
    language of the Claims Made Limitation Endorsement in the Twin
26  City policy.  By its plain terms, the endorsement precludes
    coverage for any claims excluded by the Nutmeg policy, even if
    its own policies would not preclude coverage for such claims.

1  In their earlier motion, Nutmeg and Twin City moved for

2 summary judgment on the basis of the employment exclusion clause.

3 This provision excludes coverage, they contended, because Shugart

4 and Wise were employees of "any insured," namely Aerospace, and

5 they sustained employment-related bodily injuries.  (09/22/2003

6 Order at 12.)   The court, however, found the clause ambiguous.

7 (Id. at 15.)   The court agreed that the plain language of the

8 employment exclusion clause suggests that the exclusion bars the

9 claims.  (Id.)  However, it found that the "separation of

10 insureds" clause makes the exclusion ambiguous and suggests that

11 it might preclude coverage only for claims of an employee of the

12 insured seeking coverage.  (Id.)  In light of this ambiguity, the

13 court declined to interpret the employment exclusion clause

14 because the parties' briefs had not adequately addressed OEA's

15 objectively reasonable expectations.  (Id. at 16.)

16  Nutmeg and Twin City now move again for summary judgment on

17 the basis of the "employment exclusion" clause.   Their new motion

18 centers on a determination of OEA's objectively reasonable

19 expectations regarding the interplay of these two clauses.   Under

20 California law,

21        a court that is faced with an argument for coverage
       based on assertedly ambiguous policy language must
22       first attempt to determine whether coverage is
       consistent with the insured's objectively reasonable
23       expectations.  In so doing, the court must interpret
       the language in context, with regard to its intended
24       function in the policy.  This is because language in
       a contract must be construed in the context of that

25

26
Therefore, no inconsistency is created by enforcing this
endorsement.

instrument as a whole, and in the circumstances of
that case, and cannot be found to be ambiguous in the
abstract.

Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265, 10
Cal.Rptr.2d 538 (1992) (internal quotations omitted).  "Only if
[the objectively reasonable expectation] rule does not resolve
the ambiguity do we then resolve it against the insurer."  Id.
Nutmeg and Twin City argue that, when the policy is read as a
whole and in light of the underlying purpose of the separation of
insureds clause, the separation of insureds clause does not alter
the plain language of the employment exclusion clause.  (Nutmeg
and Twin City Mot. at 7.)  For the following reasons, the court
agrees and finds that Nutmeg's interpretation of the contract
reflects the parties' objectively reasonable expectations.

California cases have interpreted exclusions with the
language "an insured" or "any insured" to exclude coverage for
damages to or by any insured, even if another insured was seeking
coverage.  See, e.g., Fire Ins. Exch. v. Altieri, 235 Cal.App.3d
1352, 1360-61, 1 Cal.Rptr.2d 360 (1991).  The separation of
insureds clause does not alter this plain language.  To the
contrary, adopting OEA's reading of the two clauses would require
the court to alter the employment exclusion clause's plain
language by negating the recognized distinction between the
phrase "any insured" and "the insured."  Such an interpretation
runs counter to the prohibition against interpreting contractual
language in such a way as to render some clauses inoperative or
meaningless.  See, e.g., City of Atascadero v. Merrill Lynch, 68

1   Cal.App.4th 445, 473, 80 Cal.Rptr.2d 329 (1998).

2      In contrast, Nutmeg's and Twin City's reading of the
3   contract is consistent with the underlying purpose of the
4   separation of insureds clause and the general principles of
5   contract interpretation.  As several courts that have examined
6   the issue closely have explained, the purpose of "separation of
7   insureds" clause is "to provide each insured with separate
8   coverage, as if each were separately insured with a distinct
9   policy, subject to the liability limits of the policy."
10  Bituminous Cas. Corp. v. Maxey, 110 S.W.3d 203, 210 (Tex. 2003).
11  Such a clause is not, however, intended to change the meaning of
12  "any insured" language in an exclusionary clause.   Id. at 214.
13  In fact, its purpose is the exact opposite.  The clause became
14  part of the standard insurance industry form contract in 1955,
15  and its purpose was aimed at "clarifying what insurance companies
16  had intended all along, namely that the term 'the insured' in an
17  exclusion refers merely to 'the insured' claiming coverage."
18  Michael Carbone, Inc. v. Gen. Accident Ins. Co., 937 F.Supp. 413,
19  419 (E.D. Pa. 1996).

20     The history of this clause makes clear that the "separation
21  of insureds" clause only affects exclusionary clauses referring
22  to "the insured," not "any insured."  Interpreted in such a way,
23  the separation of insureds clause and the employment exclusion
24  clause are consistent with one another and neither is rendered
25  inoperative or meaningless by the interpretation advanced by
26  Nutmeg and Twin city.  This interpretation is also consistent

18

1 with the general principle of construction that a specific

2 provision relating to a particular subject should govern with

3 respect to that subject as against a general provision.  E.g.,

4 Continental Cas. Co. v. Zurich Ins. Co., 57 Cal.2d 27, 35, 17

5 Cal.Rptr. 12 (1961).

6   This reading of the contract is in agreement with the

7 majority of cases that have analyzed an exclusion using the

8 language "any insured" in conjunction with a separation of

9 insureds clause.  See, e.g., Bituminous Cas. Corp., 110 S.W.3d at

10 210-214; Carbone, 937 F.Supp. at 419; Am. Family Mut. Ins. Co. v.

11 Copeland-Williams, 941 S.W.2d 625, 629 (Mo. Ct. App. 1997);

12 Northwest G.F. Mut. Ins. Co. v. Norgard, 518 N.W.2d 179, 183-84

13 (N.D. 1994).  As one recent case stated:

> To hold that the term 'any insured' in an exclusion
> means 'the insured making the claim' would collapse
> the distinction between the terms 'the insured' and
> 'any insured' in an insurance policy exclusion
> clause, making the distinction meaningless.  It would
> also alter the plain language of the clause,
> frustrating the reasonable expectations of the
> parties when contracting for the insurance.  We
> should not adopt an unreasonable construction of an
> insurance contract.
>
>     Moreover construing the term 'any' the same as
> the word 'the' in an exclusion clause when an
> insurance policy contains a separation of insureds. .
> . clause would require a tortured reasoning of the
> terms of the policy.  It would also expand liability
> beyond that bargained for by a reasonable person who
> followed the plain language of the policy and would
> invite collusion among insureds, whereby any one
> insured could make a claim for coverage of damages
> caused by any other insured.  We should not give the
> terms of a contract such an expansive reading without
> a definite expression of the parties' intent that we
> do so.

1  <u>Bituminous Cas. Corp.</u>, 110 S.W.3d at 214.

2       More importantly, the one California case directly

3  addressing this issue adopted this majority approach.  <u>Cal. Cas.</u>

4  <u>Ins. Co. v. Northland Ins. Co.</u>, 48 Cal.App.4th 1682, 1697-98, 56

5  Cal.Rptr.2d 434 (1996).  Although this case involved a different

6  context than the present case -- it dealt with an innocent wife's

7  community property liability for her husband's wrongdoing -- the

8  <u>Northland</u> court analyzed both the majority and minority line of

9  cases and specifically found the majority's rationale more

10  persuasive.  <u>Id.</u> at 1697.  The <u>Northland</u> court stated that a

11  specific exclusion should prevail over a general separation of

12  insureds clause and noted that the purpose of severability

13  clauses is to "afford each insured a full measure of coverage up

14  to the policy limits, not to negate bargained-for and

15  plainly-worded exclusions."  <u>Id.</u>  In sum, these cases, and the

16  rationale underlying their holdings, persuades the court that the

17  separation of insureds clause does not alter the plain language

18  of the employment exclusion clause in Nutmeg's policy.

19       The court is aware, as OEA notes, that other out-of-state

20  courts have disagreed with the above-described interpretation and

21  have reached a contrary holding. <u>E.g.</u>, <u>Worcester Mut. Ins. Co. v.</u>

22  <u>Marnell</u>, 398 Mass. 240, 245, 496 N.E.2d 158 (1986); <u>Premier Ins.</u>

23  <u>Co. v. Adams</u>, 632 So.2d 1054, 1056-57 (Fl. App. 1994).  However,

24  for the reasons described above, the court does not find the

25  rationale of these cases persuasive.  For one, these cases do not

26  address, and their interpretation is contrary to, the underlying

purpose of the separation of insureds clause.  Moreover, as these cases themselves admit, their interpretation renders the "any insured" language in the exclusionary clause meaningless. Accordingly, reading the policy in the way they suggest would undercut the bargained-for and plainly worded exclusions in the policy and defeat the parties' objectively reasonable expectations.[8]

OEA also contends that the employment exclusion clause is designed only to exclude coverage for employment-related practices -- such as discrimination, sexual harassment, employment-related defamation, wrongful termination, and claims of emotional distress arising from such conduct -- not bodily injury claims like the one at issue here.  (OEA Opp'n at 3-4.) Rather, another exclusion, Exclusion J, was meant to address bodily injury claims.[9]  (Id.)  However, this argument runs counter

---

[8]  OEA also argues that California case law is equally unsettled on this issue, citing a concurring opinion from the California Supreme Court in Safeco Ins. Co. v. Robert S., 26 Cal.4th 758, 776-77, 10 Cal.Rptr.2d 844 (2001) (Baxter, J. concurring).  (OEA Opp'n at 7-8.)  In his concurring opinion, Justice Baxter criticized the Northland holding and indicated his agreement with the Marnell line of cases.  Id.  However, Justice Baxter's analysis did not represent the majority opinion of the court, and this issue was not briefed or thoroughly argued before the Safeco court.  See Safeco Ins. Co., 26 Cal.4th at 766 n.2 (noting that this issue was not thoroughly discussed by the parties in their briefs to the court).

[9]  The employment exclusion clause -- Exclusion H -- states that the policy does not apply to: "Bodily injury, property damage, personal injury, employee benefits injury or advertising injury sustained by any person as the result of an occurrence directly or indirectly relating to the employment or prospective employment of any person by any insured."  Exclusion J, in contrast, states that the policy does not apply to "bodily injury to: (1) An employee of the insured arising out of or in the

1  to the plain language of the employment exclusion clause.   The

2  clause's language specifically states that the policy does not

3  apply to claims for "bodily injury . . .sustained by any person

4  as the result of an occurrence directly or indirectly relating to

5  the employment or prospective employment of any person by any

6  insured."  (Id. at 5.)   Thus, regardless of whether Exclusion J

7  does or does not provide coverage for the Shugart and Wise

8  claims, the claims are excluded by the plain language of the

9  employment exclusion clause.

10      Finally, OEA argues that Nutmeg's reading of the insurance

11  policy would render Exclusion J superfluous because anything

12  covered in Exclusion J would be covered by the "employment

13  exclusion" clause.  (Id. at 4-6.)   However, it is common for

14  multiple exclusions to apply to certain types of claims.  (Nutmeg

15  and Twin City Reply at 7.)   Therefore, the fact that more than

16  one exclusionary clause might theoretically apply to certain

17  claims does not automatically render these clauses ambiguous.

18      In sum, the court finds that the Shugart and Wise claims are

19  excluded from coverage by the employment exclusion clause

20  contained in Nutmeg's insurance policy.   The court, therefore,

21  GRANTS Twin City's and Nutmeg's motion for summary judgment.[10]

22

23  course of employment by any insured; or (2) the spouse, child,
    parent, brother or sister of that employee as a consequence of
24  (1) above."   (OEA Opp'n at 5.)

25      [10]  Nutmeg and Twin City also requested summary judgment
    based on several alternative arguments.   However, given the
26  court's holding on the employment exclusion clause, it is not
    necessary for the court to reach these issues.
        OEA contends that, whether or not Twin City or Nutmeg has a

III.

For the forgoing reasons, the court rules as follows: (1) OEA's motion for reconsideration of the court's summary judgment ruling in favor of Evanston and Royal is DENIED; (2) OEA's motion for reconsideration of the court's summary judgment ruling in favor of Lloyd's is GRANTED; (3) Twin City's and Nutmeg's motion for summary judgment against OEA is GRANTED, and OEA's cross-motion for summary judgment against Twin City and Nutmeg is DENIED.

IT IS SO ORDERED.

Dated: 7/25/2005

_DAVID F. LEVI_
United States District Judge

---

duty to indemnify OEA, they have a duty to defend the Shugart and Wise claims. (OEA's Mot. at 17-18.)  However, an insurer has no duty to defend if it can show undisputed facts that conclusively negate its coverage obligations.  Atl. Mut. Ins. Co. v. J. Lamb, Inc., 100 Cal.App.4th 1017, 1038-39, 123 Cal.Rptr.2d 256 (2002). For the reasons described above, Twin City and Nutmeg have shown that the Shugart and Wise claims are not covered by their policies; accordingly, they have no obligation to either defend or indemnify these claims.